**FIRST DIVISION**
**PHIPPS, C. J.,**
**ELLINGTON, P. J., and BRANCH, J.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**July 11, 2013**

# In the Court of Appeals of Georgia

A13A0633. BROOKS PEANUT COMPANY, INC. v. GREAT JE-032
    SOUTHERN PEANUT, LLC.

ELLINGTON, Presiding Judge.

Brooks Peanut Company, Inc. ("Brooks Peanut") appeals from an order of the Superior Court of Lee County granting summary judgment to Great Southern Peanut Company, LLC ("GSP") on Brooks Peanut's claims for breach of contract, promissory estoppel, negligent misrepresentation, fraud, and attorney fees arising out of a commodities transaction. The superior court found that GSP's alleged promise to sell peanuts to Brooks Peanut was unenforceable under the Statute of Frauds, OCGA § 11-2-201. Brooks Peanut also appeals from the order denying its motion to compel arbitration. For the following reasons, we reverse the court's grant of

summary judgment to GSP; however, we affirm the court's order denying Brooks Peanut's motion to compel arbitration.

1. Brooks Peanut contends that it produced evidence showing that a writing sufficient to satisfy the Statute of Frauds exists; therefore the trial court erred in concluding that GSP's Statute of Frauds defense bars Brooks Peanut's claims as a matter of law. We agree.

> Summary judgment is appropriate when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. On appeal from the grant or denial of summary judgment, we conduct a de novo review, construing the evidence and all reasonable inferences most favorably to the nonmoving party.

(Citation and punctuation omitted.) *Daniel Mill, LLC v. Lyons*, 283 Ga. App. 604, 605 (642 SE2d 226) (2007). So viewed, the record reveals the following relevant facts.

Brooks Peanut is a peanut shelling company operating in Samson, Alabama. GSP is a competing peanut sheller located in Lee County, Georgia. Because there is no established peanut commodities market, peanut shellers and other businesses handling peanut products often use brokers to buy and sell peanuts. Typically, the broker's fee is paid by the seller. The commodities transaction at issue in this case

2

was brokered by Mazur & Hockman, Inc. ("M & H"). Brooks Peanut and GSP have both used M & H, as well as other brokers, to buy and sell peanut products on their behalf.

In mid-September 2010, Barrett Brooks, president of Brooks Peanut, called Richard Barnhill and Jay Strother, peanut brokers with M & H, and asked them to find peanuts for his company to buy and to have delivered to his shelling facility. Brooks requested that Brooks Peanut not be identified as the buyer when M & H contacted potential sellers. According to Brooks and Strother, that is not an unusual practice. M & H solicited offers from several peanut shellers, including GSP, and conveyed them to Brooks. After reviewing the offers, on September 20, Brooks asked Strother to communicate a counteroffer to GSP's manager, Doug Wingate. Specifically, the counteroffer was an offer to buy 3,168,000 pounds of 2010 crop medium runner shelled peanuts for $.4675 per pound, to be delivered monthly throughout 2011.

According to Strother, Wingate accepted the counteroffer that same day, September 20. After Wingate accepted these terms, Strother revealed that Brooks Peanut was the buyer. According to Strother, Wingate "sighed" upon learning that a competitor was involved in the transaction; however, he did not reject the deal.

Wingate testified that, although he initially accepted the deal, he declined to consummate it when he learned that Brooks Peanut was the buyer.

On the same day, M & H prepared and then faxed to GSP and Brooks Peanut a written confirmation of the sale of peanuts. The confirmation stated: "We confirm a Sale and Purchase Transaction as described below[.]" The confirmation was printed on M & H letterhead and listed the names and addresses of the seller and the buyer, as well as terms covering price, quantity, quality, crop year, delivery schedule, and payment method. Spaces for the seller's contract number and the buyer's purchase order number were left blank. The confirmation stated that "[t]his confirmation is subject to the following condition[]: Seller's contract and Buyer's purchase order to follow[.]" Next to the term "Quality," the confirmation noted that the "American Peanut Shellers Association Trading Rules" applied to the transaction. The confirmation was signed by M & H's Strother.

GSP and Brooks Peanut each received the faxed confirmation from M & H. It is undisputed that GSP did not issue a contract and that Brooks Peanut did not issue a purchase order. After Strother sent the confirmation to GSP and Brooks Peanut, he continued communicating with the parties to finalize the logistics of the deliveries. For example, on September 21, he told Brooks that GSP had offered to haul the

peanut loads. They also discussed increasing the monthly shipments, but Wingate stated that he wanted "to stay at 6 loads a month on the [B]rooks [Peanut] contract for right now[.]"

GSP did not raise any objection to the fax confirmation until late January 2011, almost four months after M & H sent it. Wingate testified that he "did not see the need" to object to the confirmation. Beginning in January 2011, GSP took the position that, despite the confirmation, GSP and Brooks Peanut had not entered into that particular transaction because Wingate had rejected the sale when he learned that it involved his company's competitor, that M & H was not authorized to confirm the sale or to send the confirmation, and that a condition precedent had not occurred because GSP had not issued a written contract.

The evidence adduced shows that M & H had routinely brokered thousands of peanut sales between other peanut companies, shellers, and manufacturers using the same form of trade confirmation at issue here. Further, it is undisputed that GSP agreed to sell peanuts to Brooks Peanut in June 2009 and April 2010 and that such agreements were memorialized solely by M & H sending the parties confirmations that were substantially similar to the one at issue in this case.

The formal requirements of the Statute of Frauds in the context of the Georgia's Commercial Code appear in OCGA § 11-2-201, which corresponds to Section 2-201 of the Uniform Commercial Code. That Code section provides, in relevant part:

(1) Except as otherwise provided in this Code section a contract for the sale of goods for the price of $500.00 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

(2) Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) of this Code section against such party unless written notice of objection to its contents is given within ten days after it is received.

Section 2-201 (1) is the UCC's general Statute of Frauds provision. Section 2-201 (2), sometimes referred to as the "merchant confirmation rule," "the reply doctrine," or the "merchant's exception," has somewhat modified requirements

6

concerning oral agreements between merchants,[1] primarily dispensing with the

necessity of the confirmation recipient's signature.[2] As one treatise explains,

> While § 2-201 (2) stands as an exception to the UCC's general statute of frauds, § 2-201 (1), it is not entirely separate from that provision. The courts have generally held that the language in § 2-201 (1) to the effect that a writing relied upon to satisfy the statute of frauds must be "sufficient to indicate" a contract is equally applicable to § 2-201(2), although there is authority to the contrary. Similarly, the condition stated in § 2-201 (1) to the effect that a contract is not enforceable under the code beyond the quantity stated in the writing used to overcome the

---

[1] See Annotation, "Sales: Construction of Statute of Frauds Exception under UCC § 2-201 (2) for Confirmatory Writing Between Merchants," 82 ALR4th 709, § 2 [a] (2013). See also 4-21 Corbin on Contracts § 21.3 (2013).

[2] See *Edwards v. Wilbur-Ellis Co.*, 379 FSupp. 1404, 1406 (N.D. Ga. 1974) ("Under UCC § 2-201 (2), a written confirmation of an oral contract, signed by the sender, satisfies the statute of frauds and permits enforcement of the prior oral contract even though the confirmation was not signed by the recipient."). See also *Perdue Farms, Inc. v. Motts, Inc.*, 459 FSupp. 7, 13 (N.D. Miss. 1978) ("UCC § 2-201 (2) was drafted to correct an unfair condition which developed under other statutes of frauds when one contracting party sent a letter to the other contracting party to confirm an oral contract made by them. The party sending the confirmatory letter often could not invoke the statute of frauds as a defense because he had signed a writing which satisfied the statute. The party receiving the confirmatory writing had not signed the confirmatory writing. If the contract proved to be advantageous for the receiving party, he was able to enforce it against the sending merchant. But if the contract was not to the receiving party's advantage, he could refuse to perform, assert the statute of frauds as a defense and prevent the sending party from enforcing the oral contract. UCC § 2-201 (2) attempts to remove this inequity and thereby encourage the sending of writings to confirm oral contracts.") (footnotes omitted).

statute of frauds has been expressly held applicable to § 2-201 (2), as well as by implication.[3]

The record demonstrates that Brooks Peanut and GSP are merchants[4] within the meaning of the UCC and that the transaction at issue is one "between merchants."[5]

_____

[3] 82 ALR4th 709 § 2 [a].

[4] OCGA § 11-2-104 (1) provides:
"Merchant" means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.

"[A] purchaser can be considered a merchant where the purchaser is a business professional as opposed to a casual or inexperienced seller or buyer, and the purchase involves a type of goods related and necessary to the business or occupation of the purchaser." (Citations and punctuation omitted.) *Ready Trucking v. BP Exploration & Oil Co.*, 248 Ga. App. 701, 704 (2) (548 SE2d 420) (2001). Ordinarily, whether a party is a "merchant" under the UCC is a question of law for the court. Id. at 704 (2). Here there is no dispute that GSP and Brooks Peanut are merchants, and this Court will treat them as such.

[5] OCGA § 11-2-104 (3) provides that "'[b]etween merchants' means in any transaction with respect to which both parties are chargeable with the knowledge or skill of merchants."

8

Thus, we resolve this claim of error with reference to both subsections (1) and (2) of OCGA § 11-2-201.

The confirmation in this case indicates that the parties entered into a transaction for the sale of a specific quantity of goods[6] for a price exceeding $500 as required by OCGA § 11-2-201 (1). As the Supreme Court of Georgia has explained:

> The required writing need not contain all the material terms of the contract and such material terms as are stated need not be precisely stated. All that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction. . . . Only three definite and invariable requirements as to the memorandum are made by this subsection. First it must evidence a contract for the sale of goods; second, it must be "signed," a word which includes any authentication which identifies the party to be charged; and third, it must specify a quantity.

---

[6] Although peanuts are a farm commodity, they are also goods for purposes of applying OCGA § 11-2-201 (1). OCGA § 11-2-105 (1) ("'Goods' means all things . . . which are movable at the time of identification to the contract for sale[.] . . . 'Goods' also includes . . . growing crops and other identified things attached to realty as described in . . . Code Section 11-2-107[.]"); *Harris v. Hine*, 232 Ga. 183, 186 (1) (205 SE2d 847) (1974) ("Growing crops, including cotton, are 'goods' within the contemplation of [OCGA § 11-2-201 (1).]").

9

(Citation omitted.) *Harris v. Hine*, 232 Ga. 183, 186 (1) (205 SE2d 847) (1974).[7] The confirmation at issue also puts the recipient on notice that it confirms a prior oral agreement concerning the sale of goods sufficient to trigger a response by the recipient and, thus, is sufficient under OCGA § 11-2-201 (2).

GSP argues, however, that the confirmation is insufficient to show that the parties had reached a final agreement because it contains a condition that was not fulfilled, that is, that a seller's contract was "to follow." A formal, written agreement may be a condition precedent to the formation of a binding contract, when the parties so intend. When the parties intend to memorialize with a formal document an agreement that they have already reached, on the other hand, the execution of the document is not an act necessary to the creation of an enforceable contract. *Johnson v. DeKalb County*, 314 Ga. App. 790, 794-795 (1) (726 SE2d 102) (2012); *Pourreza v. Teel Appraisals & Advisory*, 273 Ga. App. 880, 883 (616 SE2d 108) (2005).[8] In this

---

[7] See also, *Bicknell v. Joyce Sportswear Co.*, 173 Ga. App. 897, 897-898 (2) (328 SE2d 564) (1985) (An invoice for the sale of goods from one merchant to another satisfied the requirements of the Statute of Frauds.); *Dalesso v. Reliable-Triple Cee,* 167 Ga. App. 372, 373 (1) (306 SE2d 415) (1983) (Invoices sent from one merchant to another constituted written confirmation of the contract between them within the meaning of OCGA § 11-2-201 (2).).

[8] See also *Lambert Corp. v. Evans*, 575 F.2d 132, 135 (7th Cir. 1978) ("Even if parties agree, point by point, on all the terms of a contract, if they understand that

10

case, there is no evidence that the parties intended the execution of the seller's contract to be a condition precedent, especially since the parties had previously consummated deals using broker confirmations only.

The record also contains evidence showing the applicability of OCGA § 11-2-201 (2) in that GSP received the written confirmation within a reasonable time, given that the record shows that it was sent by fax and received on the same day that the oral agreement was allegedly reached. Further, GSP had reason to know of the confirmation's contents, given that Wingate had been a party to the negotiations. And it is undisputed that GSP failed to object to the confirmation in writing within days.

GSP argues, however, that the confirmation was not "signed" by GSP or by its authorized agent or broker, and thus fails to satisfy the requirements of OCGA § 11-2-201 (1). It also argues that the confirmation was not "sufficient against the sender" within the meaning of OCGA § 11-2-201 (2)[9] because it was not signed by Brooks

_____

the execution of a formal document shall be a prerequisite to their being bound there is no contract until the document is executed. On the other hand, if it is agreed that a formal document will be prepared to memorialize a bargain the parties have already made, the bargain is enforceable even though the document has not been executed.").

[9] We have held that, in order for a confirmation to be "sufficient against a sender" within the meaning of OCGA § 11-2-201 (2), it also must be "signed" by the sender, as set forth in OCGA § 11-2-201 (1). *Jackson v. Meadows*, 153 Ga. App. 1, 2 (1) (264 SE2d 503) (1980) ("An unsigned invoice is not a writing in confirmation

11

Peanut or its authorized agent or broker. GSP argues that, because Brooks Peanut had taken the position at the outset of the litigation that M & H was GSP's agent, not Brooks Peanut's, then M & H could not have signed or sent the confirmation on behalf of Brooks Peanut.[10] We disagree. There is at least a jury issue regarding whether M & H acted as Brooks Peanut's agent, as GSP's agent, or as an agent for both in brokering the sale and in signing and sending the confirmation.

OCGA § 10-6-1 provides that "[t]he relation of principal and agent arises wherever one person, expressly or by implication, authorizes another to act for him or subsequently ratifies the acts of another in his behalf."[11]

---

of the contract.") (citation omitted); *Evans Implement Co. v. Thomas Indus.*, 117 Ga. App. 279, 280 (160 SE2d 462) (1968). A signature sufficient to satisfy the Statute of Frauds, however, does not have to be the handwritten signature of a person. An invoice on a printed form that bears the seller's name and address is "sufficient against the sender" and may constitute a written confirmation of a contract within the meaning of OCGA § 11-2-201 (2). *Jem Patents, Inc. v. Frost*, 147 Ga. App. 839, 839-840 (1) (250 SE2d 547) (1978). Additionally, OCGA § 11-2-201 (1) provides that the signature on the confirmation may be that of the sender's authorized agent or broker.

[10] In its initial complaint, Brooks Peanut averred that M & H acted as agent for the seller, GSP. Brooks, Barnhill, and Strother each gave affidavits contending that M & H acts as the seller's agent. Brooks Peanut later contended that M & H was also an agent of Brooks Peanut, or a dual agent, acting for both the seller and the buyer in every transaction.

[11] There is no evidence in the record that M & H acted as the exclusive agent for any peanut sheller, nor is there any written agency agreement of record

Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act. The existence of agency and the extent of the agent's authority are questions of fact. A claim of agency may be proved, as any other fact, by circumstantial evidence. The fact of agency may be established by proof of circumstances, apparent relations, and the conduct of the parties. Direct evidence of an agency relationship is not required.

(Punctuation and footnotes omitted.) *Southeastern Exposition Mgmt. Co. v. Genmar Indus.*, 250 Ga. App. 702, 704-705 (551 SE2d 830) (2001). Further, an agent may be a dual agent, serving two principals. See *Merry Bros. Brick & Tile Co. v. Jackson*, 120 Ga. App. 716, 719 (171 SE2d 924) (1969) ("[O]ne may be the servant of two masters and subject to the demands of both or either.") (citations omitted).

GSP argues that, under *Prophecy Corp. v. Charles Rossignol, Inc.*, 256 Ga. 27 (343 SE2d 680) (1986), Brooks Peanut is bound to its initial position regarding M & H's agency status. Under *Prophecy*, a trial court construing a party's self-contradictory sworn testimony on a material fact should disregard the portions of that testimony that favor the party when deciding a motion for summary judgment,

establishing that M & H acted as agent for either Brooks Peanut or for GSP in the transaction at issue in this case.

13

unless the party offers a reasonable explanation for the contradiction. Id. at 30 (2). The *Prophecy* rule, however, is inapplicable under these circumstances. First, there is no contradiction inherent in Brooks' testimony that M & H was GSP's agent and his testimony that M & H was Brooks Peanut's agent, because an agent may be a dual agent. Further, the rule "applies only to self-contradictions in a party's sworn testimony. It does not apply to unsworn statements, non-party witness testimony, or contradictions between a party's testimony and another person's testimony." (Footnotes omitted.) *CSX Transp., Inc. v. Belcher*, 276 Ga. 522, 523 (1) (579 SE2d 737) (2003). In this case, the record contains documentary evidence as well as testimony from non-party witnesses (M & H's brokers) from which a jury may infer that M & H acted as GSP's agent, Brooks Peanut's agent, or as an agent for both in this transaction. Given these circumstances, the record contains evidence from which the factfinder could infer that the writing was signed by both parties to the transaction through their agent *and* that the confirmation was signed by the sender's agent such that it was sufficient against the sender. Consequently, GSP is not entitled to summary judgment based upon on its Statute of Frauds defense, and the trial court's order must be reversed.

2. Brooks Peanut contends that the trial court erred in entering judgment in GSP's favor on its claims for promissory estoppel, negligent misrepresentation, fraud, and attorney fees. Because GSP is not entitled to summary judgment on the basis of the Statute of Frauds, for the reasons stated in Division 1, supra, the trial court's order with respect to these claims must also be reversed.

3. Finally, Brooks Peanut contends that the trial court erred in denying its motion to compel arbitration. It argues that, because the M & H confirmation contains a reference to the American Peanut Shellers Association Trading Rules next to the term "Quality," Brooks and GSP are bound by the arbitration provisions contained within those rules. We disagree.

"Arbitration is a matter of contract, meaning that arbitrators derive their authority to resolve disputes only from the parties' agreement." (Citation, punctuation, and footnote omitted.) *Doman v. Stapleton*, 256 Ga. App. 383, 388 (1) (568 SE2d 509) (2002). Thus, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." (Citation and punctuation omitted.) *Krut v. Whitecap Housing Group*, 268 Ga. App. 436, 442 (2) (c) (602 SE2d 201) (2004). "[T]he question of arbitrability, i.e., whether an agreement creates a duty for the parties to arbitrate the particular grievance, is undeniably an issue for judicial

determination." (Citation, punctuation, and footnote omitted.) *Helms v. Franklin Builders*, 305 Ga. App. 863, 864 (700 SE2d 609) (2010). Thus, we review the trial court's order de novo, applying the ordinary rules of contract construction. *SCSJ Enterps. v. Hansen & Hansen Enterps.*, 319 Ga. App. 210, 212 (1) (734 SE2d 214) (2012).

In order to find merit in Brooks Peanut's argument, we would have to hold not only that the confirmation at issue is a writing that satisfies the Statute of Frauds under OCGA § 11-2-201, but that the confirmation also constitutes, as a matter of law, an enforceable contract that contains an arbitration clause. See *Dixie Aluminum Products Co. v. Mitsubishi Intl. Corp.*, 785 FSupp. 157, 160-161 (N.D. Ga. 1992) (Having found that a confirming document was the contract between the parties, the court concluded that all of the terms contained therein, including an arbitration provision, were binding and could not be contradicted by parol evidence.). We need not address whether the confirmation at issue constitutes an enforceable contract for the sale of goods under these circumstances to resolve this claim of error.[12] Rather,

---

[12] Although a writing may be sufficient as evidence of a contract and satisfy either OCGA § 11-2-201 (1) or (2), the Statute of Frauds does not require the writing to resolve whether a contract exists or to establish all of the contract's terms and conditions. "The party asserting the contract still must bear the burden of proving its existence and the terms." (Citation omitted.) *Jinright v. Russell*, 123 Ga. App. 706,

16

because it is clear from the face of the confirmation that it does not contain or incorporate by reference an arbitration clause or provision, Brooks Peanut's argument must fail.

First, the word "arbitration" does not appear on the M & H confirmation, nor is there any other word, phrase, clause, or condition referencing dispute resolution generally. Further, the confirmation references the American Peanut Shellers Association Trading Rules only on the line provided for defining the "quality" of the commodity being sold, that is, in this case, a "medium runner shelled peanut" of "U. S. Grade."

> Where a writing refers to another document, that other document, *or as much of it as is referred to*, is to be interpreted as part of the writing. . . . As a matter of contract law, incorporation by reference is generally effective to accomplish its intended purpose where . . . the provision to which reference is made has a reasonably clear and ascertainable meaning.

708 (1) (182 SE2d 328) (1971). Thus, our holding that the evidence adduced was sufficient to defeat GSP's motion for summary judgment on Statute of Frauds grounds is not tantamount to a finding that Brooks Peanut has proven the existence of an oral contract for the sale of goods.

(Citations and punctuation omitted; emphasis supplied.) *Consolidated Freightways Corp. v. Syncroflo, Inc.*, 164 Ga. App. 275, 277 (1) (294 SE2d 643) (1982). A review of the trading rules confirms that they contain sections specifically addressing standards, grades, and classifications for peanut stock. The reference to the trading rules in this context has only one reasonably clear and ascertainable meaning: that the trading rules were meant to govern how peanut "quality" was defined for purposes of the instant transaction and not to provide for the remedy of arbitration. See *Williams Tile & Marble Co. v. Ra-Lin & Assocs.*, 206 Ga. App. 750 (1) (426 SE2d 598) (1992) (The "'reasonably clear and ascertainable meaning'[of an incorporated provision] was only to specify the material and manner of installation of the terrazzo flooring, and not to provide for the remedy of arbitration which did not otherwise exist in the general contract.") (citation omitted). Consequently, the trial court did not err in denying Brooks Peanut's motion to compel arbitration.

*Judgment affirmed in part and reversed in part. Phipps, C. J., and Branch, J., concur.*